## ANTHONY et al., Appellants, v. KENNARD BUILDING COMPANY.

### Division One, May 24, 1905.

1. **EQUITY: Effect of Demurrer.** Strictly speaking, sustaining a demurrer to the evidence in an equity case means the same thing that it does in a law case. In either case, the overruling of a demurrer to the evidence and a subsequent finding for defendant mean that as a matter of law there is some evidence to be weighed, but as a matter of fact the evidence when weighed by the trier of fact is not satisfactory. Yet where the court at the close of plaintiff's evidence and the offering of the demurrer thereto really treated the case as submitted for a finding of the facts on the evidence and dismissed the bill, but also stated that "the demurrer to the evidence is sustained," its action will not be reversed because it did not thereby strictly give to the demurrer its technical meaning.

2. **EASEMENT: Leasehold: Alley: Right of Lessee.** Where an alley is an appurtenance to a leasehold, the lessees have the right to maintain suit to prevent interference with their use of the same, even though their landlord claims no such right. Yet the lessees have no greater right than the landlord under whom they claim would have were he to assert it.

3. ———: **How Established.** An easement lies only in grant. Yet evidence to establish it is not necessarily a deed, because an easement may have existed for such a length of time and under such circumstances that the law will presume a grant. This is what is meant by an easement established by prescription.

4. ———: ———: **By Prescription or Limitation.** When the evidence sufficiently shows the use of the privilege for a length of time equal to that prescribed by the Statute of Limitations for acquiring land by adverse possession, and that the use was adverse and under a claim of right, with the knowledge of the land-owner, the right to easement is established.

5. ———: ———: **Notice.** Express notice to the owner of the use to which the land was being put, and of the character of the use, and that it was under a claim of right is not necessary to maintain a right to an easement in land; notice of those things is necessary, but it may be inferred from the circumstances, if the circumstances are sufficient to justify the inference.

6. ———: ———: ———: **Presumed From Use.** Where there has been actual continuous use for the prescribed period, of the land in which an easement is claimed to exist, under a claim of right, with the knowledge of the owner, the law will raise a presumption of a grant, unless the owner can show that the use was by permission; and under such circumstances the burden is on the owner to show the permission.

7. ———: **Essential Facts.** There are four essential facts for one to prove who seeks to establish his easement by prescription in lands: first, user for the prescribed period; second, that the user was adverse; third, that it was under claim of right; fourth, notice to the owner, of the user, and of its character, and of the claims of right.

8. ———: **Evidence.** In attempting to raise a presumption of an old grant from user and conduct of the parties, observation must not be confined to the conduct of one party only.

9. ———: ———: **Conveyances.** Warranty deeds of trust, executed and recorded by the lessee's landlord during the time the easement is claimed to have existed, in which was included the whole of the lot owned by him and the whole of the alley in which the lessee claims that he and the owner of the lot adjoining the alley on the opposite side had cross-easements as appurtenant to such lots, were public proclamations of a repudiation by the landlord of any such easement, and are totally inconsistent with a claim of a cross-easement in the alley by the landlord and by the owner of the lot adjoining the alley on the other side.

Vol 188 mo—45

10. ——: ——: Use. Mere use of a passage over another's land for a long time with his knowledge is not necessarily an adverse use. The circumstances may be such as to indicate that the use was by permission.

11. ——: ——: Permissive Use: Burden. The burden of showing that the use of a passageway over land was by permission is not on the owner if the circumstances shown by the claimant of the easement are as consistent with a permissive use as with an adverse use.

12. ——: ——: Neighborly Use. If the owner of land opens a road across it for his own use and uses it and keeps it open for his own use, the fact that he sees his neighbor also make use of it, under circumstances that in no way injures the road or interferes with his own use of it, does not justify the inference that he is yielding to his neighbor's claim of right or that his neighbor is asserting any right, or that the neighbor's use is adverse to him.

Appeal from St. Louis City Circuit Court.—*Hon. Horatio D. Wood*, Judge.

AFFIRMED.

*Rassieur, Schnurmacher & Rassieur* for appellants.

(1) The court sustained a demurrer to plaintiffs' evidence. In actions in equity, as well as at law, the demurrer to the evidence concedes every fact which the evidence tends to prove, and every inference fairly deducible from the facts proved. Hence, if there is any evidence in the record, from which adverse user, or user as of right, might be inferred, the trial court erred in sustaining the demurrer to the evidence. Healey v. Simpson, 113 Mo. 345; Patton v. Bragg, 113 Mo. 600; Bank v. Simpson, 152 Mo. 656. (2) Upon such a record, the appellate court does not defer to the finding of the trial court, for there is no finding of facts by the trial court. In sustaining the demurrer, the trial court decides that the evidence does not tend to prove, directly or inferentially, the issues tendered. (3) Knowledge of user is presumed where the user has been open and notorious. When the circumstances do not indicate a

user, by permission, a presumption arises, from the proof of user as of right for the statutory period, that the user was adverse.   Jones on Easements (1898), secs. 164, 186; Washburn on Easements and Servitudes (4 Ed.), 156; Thompson on Highways, Ways, etc., chap. 414; Barnes v. Haynes, 13 Gray (Mass.) 188; Blake v. Everett, 1 Allen (Mass.) 248; Stearns v. Janes, 12 Allen 582; O'Daniel v. O'Daniel, 88 Ky. 189.   (4) When the Statute of Limitations once begins to run, it does not become interrupted by subsequent causes of disability, such as coverture, minority, etc.   Pim v. City, 122 Mo. 654; Jones on Easements, sec. 199.   (5) Through the tenant's adverse user a right of easement enures to him and his lessor.   Smith v. Kinard, 2 Hill (S. C.) 642.

*Bryan & Christie, John H. Drabelle, George D. Reynolds* and *George V. Reynolds* for respondent.

(1) Mere lapse of time or length of user, no matter how long the user may be exercised, will not give rise to an easement by prescription.   Hunnewell v. Burchert, 152 Mo. 611; Hunnewell v. Adams, 153 Mo. 440; Smith v. Sedalia, 152 Mo. 283; Pitzman v. Boyce, 111 Mo. 287; Golterman v. Schiermeyer, 125 Mo. 291; Vaughan v. Rupple, 69 Mo. App. 583; Kirk v. Smith, 9 Wheat. 241; Maple v. Stevenson, 122 Ind. 370; Plimpton v. Converse, 44 Vt. 158; Clark v. Paquette, 66 Vt. 386; Zigefoose v. Zigefoose, 69 Iowa 391; Malone on Real Property Trials, 270.   (2) No easement could arise unless the alleged user was continuous and exclusive for the full period of time, and unless also it was hostile and adverse to the true owner and under a claim of title by Mrs. Abadie or some one in her behalf.   Pitzman v. Boyce, 111 Mo. 387; Field v. Mark, 125 Mo. 502; Brinck v. Collier, 56 Mo. 160; Dunham v. Joyce, 129 Mo. 5; Coberly v. Butler, 63 Mo. App. 556; Hunt v. Adams, 86 Mo. App. 73; Bryan v. East St.

Louis, 12 Ill. App. 390; Railroad v. Munsell, 192 Ill.
430; Dexter v. Tree, 117 Ill. 532; Crawford v. Ahrnes,
103 Mo. 88; Nelson v. Nelson, 41 Mo. App. 130; Wilker-
son v. Eilers, 114 Mo. 245. (3) The user in the case
at bar was neither hostile nor adverse nor in any way
inconsistent with an unincumbered title in the respond-
ent and the persons under whom it claims, but such
user was entirely consistent with such title, and existed
under the neighborly accommodation of the holder of
such title; hence, no easement could arise. Field v.
Mark, 125 Mo. 502; Brinck v. Collier, 56 Mo. 160; Rail-
road v. Ives, 202 Ill. 69; Railroad v. Conlon, 53 L. R. A.
781; Organ Co. v. Forbes, 29 So. 683; Hunt v. Adams,
86 Mo. App. 73; Coberly v. Butler, 63 Mo. 556; Vaughan
v. Rupple, 69 Mo. App. 583; Nelson v. Nelson, 41 Mo.
App. 130; Stacy v. Miller, 14 Mo. 478; Hunnewell v.
Adams, 153 Mo. 440; Pitzman v. Boyce, 111 Mo. 387.
(4) (a) In order to create an easement, it was necessary
that the alleged user should also have been under a claim
of right in Mrs. Abadie as owner of the fee to such
user. No tenant of Mrs. Abadie could prescribe except
in the name of Mrs. Abadie. Goddard on Easements,
145; Washburn on Easements (4 Ed.), 129; Smith v.
Kinard, 2 Hill (S. C.) 642; Perley v. Hilton, 55 N. H.
444. (b) There was no claim of right in this case,
hence, no easement could arise. Hunnewell v. Burchert,
152 Mo. 611; Hunnewell v. Adams, 153 Mo. 444; De
Bernardi v. McElroy, 110 Mo. 650; Vaughan v. Rupple,
69 Mo. App. 583. (5) Neither was the alleged user
uninterrupted, nor was its alleged adverse character
open and notorious, nor was it such that respondent had
any reason to believe that it was meant to be adverse,
or under any claim of right. Downing v. Dinwiddie,
132 Mo. 92; Curtis v. Water Co., 20 Ore. 34; Morse v.
Williams, 62 Me. 445. (6) The burden of proof was
upon appellants to clearly prove by a preponderance of
evidence all the elements essential to a title by prescrip-
tion. The burden was upon appellants to show by a

preponderance of evidence not only a user, but in addition thereto and as independent facts, to further show "that it was exercised adversely and under a claim of right" in Mrs. Abadie. Smith v. Sedalia, 152 Mo. 283; Hunnewell v. Burchert, 152 Mo. 611; Hunnewell v. Adams, 153 Mo. 440; Dammeron v. Jamison, 143 Mo. 483; District of Columbia v. Robinson, 180 U. S. 92; Lynde v. Williams, 68 Mo. 360; Clark v. Clark, 133 Cal. 667; Wilson v. Railroad, 83 Tex. 153; Dewey v. McClain, 7 Kan. 126; Wilkerson v. Thompson, 82 Mo. 317; Whaley v. Jarrett, 69 Wis. 613; 2 Greenleaf on Evidence, sec. 539. (7) The law presumes that every user is rightful and consistent with the true title and ownership and not in opposition or adverse thereto. Hunnewell v. Burchert, 152 Mo. 611; Smith v. Sedalia, 152 Mo. 283; Organ Co. v. Forbes, 29 So. 683; Rose v. Farmington, 196 Ill. 226; Bryan v. East St. Louis, 12 Ill. App. 390. (8) Particularly is this true where, as in the case at bar, the Kennard Building Company and its grantors had a way for the use of their own premises, and the use by other persons was without causing damage to respondent or its predecessors in title. In such cases the use is held to be permissive under an implied license and as a neighborly indulgence, and is held not to be adverse or under claim of right. From such neighborly use, no matter how long continued, no easement could arise. Field v. Mark, 125 Mo. 502; Pitzman v. Boyce, 111 Mo. 387; Brinck v. Collier, 56 Mo. 166; Stacy v. Miller, 14 Mo. 478; Coberly v. Butler, 63 Mo. App. 556; Nelson v. Nelson, 41 Mo. App. 130; Frye v. Village of Highland, 85 N. W. 351; Railroad v. Conlon, 53 L. R. A. 781; Reed v. Garnett, 23 S. E. 182; Railroad v. Ives, 202 Ill. 69; Wood v. Reed, 30 N. Y. Supp. 112; Cook v. Gammon, 93 Ga. 298; Jones on Easements, sec. 270; Washburn on Easements (4 Ed.), 152. (9) Appellants' claim of easement must fail for the further reason that it is based upon an alleged cross-easement in favor of this respondent's predecessors in

title against Mrs. Abadie.  Since Mrs. Abadie, during the entire time of the alleged user, was a *femme covert,* no adverse user could operate against her, and the basis of appellants' alleged claim would fail.  Washburn on Easements (3 Ed.), 163; Rothwell v. Jamison, 147 Mo. 601; Goddard on Easements, 162.

VALLIANT, J.—This is a suit in equity by which the plaintiffs seek to enjoin the Kennard Building Company from erecting their building so as to cover a strip of land over which plaintiffs claim an easement as an alley appurtenant to property held by them by leasehold.

In 1899 the defendant, the Kennard Building Company, acquired from Mrs. Drummond, the owner in fee, a lease for a term of ninety-nine years of certain real estate in St. Louis fronting east on the west line of Fourth street, extending from Washington avenue on the north to St. Charles street on the south, measuring its east line 150 feet 8 5-8 inches on the west line of Fourth street, its north line 90 feet 2 1-8 inches on the south line of Washington avenue, and its south line 110 feet 10 1-2 inches on the north line of St. Charles street.  The west lines ran as follows: beginning at a point in the south line of Washington avenue 90 feet 2 1-8 inches west of its intersection with the west line of Fourth street, thence south parallel with the west line of Fourth street 75 feet 4 1-2 inches, thence west parallel with the south line of Washington avenue 20 feet 8 1-4 inches, thence south 75 feet 4 1-2 inches to a point in the north line of St. Charles street 110 feet 10 1-2 inches west of its intersection with the west line of Fourth street.

In March, 1890, Henry Anthony, now deceased, under whom the plaintiffs claim, acquired from Mary L. and Eugine S. Abadie a lease for a term of fifty years of a lot adjoining on the west of that above described and fronting on the south line of Washington

avenue on which line it measures 29 feet 1 7-8 inches, with a depth southward of 75 feet 3 1-3 inches. The fee of this lot is in Mary L. Abadie, her husband Eugine S. Abadie having therein a right as tenant by the curtesy initiate.

At the date of the lease to the Kennard Company, above mentioned, the land embraced in it was covered, except the alley in question, by a row of buildings called the Veranda Row, sometimes also called the Armory Hall Building, the first story of which was divided so as to form a number of stores or shops, some fronting Fourth street and some Washington avenue, and at the same time the lot now occupied by the plaintiffs was covered, except a strip 2 feet 1 3-4 inches wide on the east side, by a three-story brick building, 27 feet wide by 65 feet long, designed originally for a dwelling, but which has been used for thirty years or more for a restaurant, saloon, etc. In 1890 the remaining 10 feet of the rear of plaintiffs' lot, which up to that date had been used as a back yard, was covered by a one-story addition to the building; thus the plaintiff's building covered all their lot except the strip of 2 feet 1 3-4 inches on the east line.

The dates of the erection of these buildings are not given in the evidence, nor does it appear which, if either, is the older; the evidence only shows that the buildings were there and the alley between them was there in 1858. For convenience we will call the premises now held by the plaintiffs the Abadie property, and that covered by the Veranda Row and now held by the Kennard Building Company we will call the Ames property.

The alley in controversy begins on the north line of St. Charles street, having for its west line the west line of the Ames property, and its east line parallel thereto running north about 65 feet with a width of 4 feet 9 1-2 inches, thence east about 20 feet with a width of 9 feet 10 inches, thence north 75 feet with a width

of 5 feet 3 1-2 inches to Washington avenue, all of which is on the Ames property except that of the space of the 5 feet 3 1-2 inches between the above-named buildings, extending from the rear of the Abadie lot 75 feet to Washington avenue, 2 feet 1 3-4 inches are on the Abadie lot.

The plaintiffs in their petition say that "more than thirty years ago, the then holders of said adjoining lots granted to each other for themselves and their heirs and assigns forever, by deed of conveyance in due from, a right of easement in said strip or private alley for general user for alley purposes, with rights of ingress and egress through and upon said strip from one end to the other, to or from their respective lots, but such deed of conveyance or grant has been lost and no record thereof preserved and plaintiffs state that for more than thirty years and for a time whereof the memory of man runneth not to the contrary, the then owners of the lot above described, leased to plaintiffs as aforesaid, and their heirs, grantees and assigns, and the occupants of said premises have continuously, uninterruptedly, notoriously, openly and adversely been using the said strip of land for alley purposes and for the purposes of ingress and egrss from one end of said alley to the other and have during all of said time continuously, uninterruptedly, notoriously, openly and adversely been exercising their right of easement therein."

The petition then goes on to say that the Kennard Building Company is about to erect a building on its leased land to cover all that part of the alley that lies on its own land and thereby destroy plaintiffs' easement, and prays an injunction to prevent the threatened wrong.

The answer of the Kennard Company admitted that it had acquired a ninety-nine year lease of the land and that its purpose was to erect a building covering the alley, that is, so much of the alley as was on its own

land, and denied that plaintiffs had any easement therein.

The cause first came on for hearing before the circuit court on the motion of the plaintiffs for a temporary injunction, whereupon the court heard the evidence offered and denied the motion.

Previous to the filing of the suit the Kennard Company had entered into contracts for the erection of the building at a total cost of about $250,000, work under which was suspended, after suit brought, until the hearing of the motion for a temporary injunction, but when that motion was denied, the company, under the advice of its counsel, proceeded with the work and the building has since been completed.

At the final hearing the evidence on the part of the plaintiffs tended to show as follows:

The west walls of the Veranda Row buildings, above ground, were on the east lines of this alley, but the cellars extended to the west line; there were windows and doors in the west walls of the Veranda Row opening on the alley and areaways opening through the alley into the cellars, affording the tenants of the Veranda Row light and air from the rear and rear ingress and egress to and from their premises, also through the area openings in the alley the means of conveying fuel, etc., into the cellars. There was also a stairway about three feet wide in the south half of the alley etending from the ground up to the Armory Hall, which was on the top floor of the Veranda Row. This stairway was used for access to the Hall, particularly for the purposes of carrying refreshments, etc., when entertainments were held there.

There were windows on the east side of the Abadie building, opening on the alley, but there were no doors there and no area ways or entrances through the alley into the cellar of that building; the entrance to that cellar was through the sidewalk in front on Washington avenue.

From 1858 down to the commencement of this suit this alley had been there and had been used for the purposes for which an alley is usually designed by the tenants of the Veranda Row, and the north half of it was also used by the occupants of the Abadie property as ingress and egress to and from the rear of their building; patrons of the restaurant also frequently came in the rear through the St. Charles street end of the alley; and the public used it as a passway when convenient.

There was also a gate at each end which was designed to be kept locked at night and open during the day. The tenants in the Veranda Row had keys to both gates and the tenant of the Abadie property had a key to the gate at the Washington avenue end. It was sometime between 1870 and 1880 that the gate at the Washington avenue end was erected. Mr. Ames, who then owned the Veranda Row, discovered that the public were making a nuisance of the alley and spoke to Mr. Abadie about closing it with a gate. Mr. Abadie at first objected, but afterwards consented, with the agreement that his tenant was to have a key. The alley was paved with brick, by whom the evidence does not show. The servants in the restaurant generally kept the Washington avenue end swept and locked the gate at night.

There was some evidence that prior to 1870 there was an outhouse in that portion of the alley running east and west south of the Abadie property, which was used by the tenants of both properties, but it is doubtful if the plaintiffs' evidence shows that the outhouse was altogether in the alley. One of plaintiffs' witnesses (Morese) located the part in use by the Abadie tenants as on the Abadie lot. In 1890 Anthony constructed a beam to project from a window in his third story with a rope and pulley attached which served to bring supplies, etc., into his kitchen. That however did not ex-

tend into the alley beyond two feet and is not inter-fered with by the Kennard Building.

Mr. Abadie, the husband of the lady who owns the fee in the Abadie lot, was a witness for plaintiff, and testified that his memory of the property went back to 1867 or 1868, from which time down to the lease to the plaintiffs' testator he had frequent observations of it. He testified that he never heard of any agreement between the respective owners of the properties in reference to the alley; he knew nothing except what was to be inferred from the buildings and the use that was made of the alley. He said he never considered the south half of the alley as having any reference to his property, but as to the north half it was used by the tenants of both properties in common ever since he had known it, and so used with the knowledge of the owners. When asked as to his understanding of the rights of the parties in using the alley he said: ''To make myself plain, gentlemen, I want it understood that if we had any right in that alley it was based upon the construction of those two buildings, and as long as those buildings remained in their present time condition, the alley easement or right that we had was valuable, from the standpoint of depth, otherwise five feet wide, I should say. Of course the removing of three feet of that so-called alley would destroy the intent, if you please, in constructing a five-foot alley, leaving only two feet two, or whatever it was from the building line to the east line; that is, from our building to the east; I think it is two feet two or a fraction. That is what I meant to say; otherwise as it is now it is useful for both sides of the tenants. If you take ours off or take the other off, it wouldn't be useful to either one of the occupants of the building.''

And on cross-examination he expressed it thus: ''Q. You said a short time ago, Mr. Abadie, that it was a peaceful family? What did you mean by that, 'peaceful family'? A. Well I mean it in this way. Our

tenants and the tenants of the owners of the other buildings used a piece of property in common and as neighbors; they were peaceful, for the reason that they evidently didn't encroach upon what they termed the rights or interfere with each other, so that I heard of no complaints. You understand what I mean by a peaceful family? Q. Yes, they used it, one another in a neighborly way? A. Yes, sir; that is a better way to put it; you put it better than I can.''

Abadie and wife between 1870 and 1880 executed three deeds of trust in which they conveyed all of their lot, including the 2 feet 1 3-4 inches in the alley, and warranted the title. In their lease to Henry Anthony in 1890, under which the plaintiffs claim, they convey their whole lot including this 2 feet 1 3-4 inches. The only reference to the alley in any of the title papers in evidence is in the deed from the Ames Realty Company to Mrs. Drummond in 1898 conveying the Veranda Row property, which reference is in these words: ''Subject, however, to any rights that may have been acquired or established by user by the adjoining owners of rights of way.'' Mrs. Drummond conveyed to the Kennard Company with full warranty without exception.

The evidence that the houses were there with the alley between them as far back as 1858 and that it was used as a passway by every one who chose to use it, referred only to user of a general character, the particular facts relied on to show the character of the user occurred after Mr. Abadie's interest in the property accrued and during his supervision of it, that is, after 1870, and more particularly after 1890.

When the cause was first heard on the motion for a temporary injunction the Abadies were not parties, but before the final hearing they were made parties defendant by amendment of the petition, under the statement that they were interested but had refused to join as plaintiffs and were therefore made defendants.

They filed their answer in which they admitted that Mrs. Abadie was the owner in fee of the property held by the plaintiffs under lease, and that she and her husband executed the fifty-year lease to Henry Anthony, under which plaintiffs claim, but they denied that they or any one under whom they claim had ever made any contract or agreement of any kind concerning the alley and denied that they had granted any right to such to the plaintiffs, and averred that they had no interest in the suit.

At the close of the plaintiffs' evidence the following colloquy occurred:

"Mr. Bryan: If the court please, we now move to dismiss the bill. Our motion is in the nature of a demurrer to the evidence. We submit they have shown no adverse user here, no hostile user of any kind.

"The Court: It seems to me, gentlemen, that only a permissive right to use this alley is shown. Do you rest your case, gentlemen, on this testimony?

"Mr. Bryan: We ask to have the bill dismissed, if the court please. We have testimony here, but we do not see any use in going into it, for we contend that plaintiff has not made out any case. There was nothing adverse or hostile in it and there is no evidence to show that anything that was done was done under any claim of title.

"The Court: Well, I take that same view, and I ask whether you rest your case here. However, I will sustain a demurrer to the evidence.

"Mr. Reynolds: I want to offer a special demurrer as far as Mr. and Mrs. Abadie are concerned, to the effect that they have shown no right as against us, outside of the lines mentioned in the lease.

"The Court: Yes, sir, that is correct.

"Mr. Rassieur: The court is sustaining a demurrer and there is no demurrer offered. Will you prepare your demurrer and have it acted upon? Now,

then, what further action is the court going to take?

"The Court: Well, I will dismiss the bill.

"Mr. Rassieur: I just want to know what the record is going to show.

"The Court: This is just the same, Mr. Rassieur, as if all the evidence had been put in on both sides; that is, I render a decree dismissing the bill, for want of equity in the case. Demurrer to the evidence is sustained and the bill dismissed."

A decree for defendants followed and the plaintiffs appealed.

I. Appellants' first point is that whatever the chancellor's opinion might have been as to the weight of the evidence it was error to sustain the demurrer, because, they say, a demurrer to the evidence means that there is no evidence at all from which even an inference in support of plaintiffs' case can be drawn, citing Healey v. Simpson, 113 Mo. 340; Patton v. Bragg, Id. 600; Bank v. Simpson, 152 Mo. 638.

Respondent meets this point by saying first that there was no evidence tending to show that the user was otherwise than permissive; second, that the case did not really go off on a demurrer to the evidence.

Strictly speaking, sustaining a demurrer to the evidence in an equity case means the same that it means in a law case; it means that there is no evidence tending to sustain the plaintiffs' case, and therefore none for the trier of fact to weigh. In a law case the court might with propriety overrule a demurrer to the plaintiffs' evidence, and the jury might with equal propriety find for the defendant; and the same is true in an equity case, the court might overrule the demurrer to th plaintiffs' evidence, and yet when the case is submitted on the evidence find for the defendant. In each case it means that as a matter of law there is some evidence to be weighed, but as a matter of fact the evidence when weighed by the trier of fact is not satisfactory.

But the attention of the trial court in this case was not drawn to this technical point. The colloquy shows that whilst the word demurrer was used by the court and the counsel, yet the court really treated the case as submitted for a finding of the facts on the evidence. The final sum of the matter by the court was: "This is just the same, Mr. Rassieur, as if all the evidence had been put in on both sides; that is, I render a decree dismissing the bill for want of equity in the case." That clear statement became a little clouded by the sentence which followed: "Demurrer to the evidence is sustained and the bill dismissed," but we do not think its meaning is changed.

II. The plaintiffs, as lessees of the Abadies, claim that this alley is an appurtenance to the premises embraced in their leasehold. If that is so they have a right to maintain a suit to prevent interference with their use of the same even though the Abadies claim no such right. [Jones on Easements, sec. 873.] Yet as the plaintiffs claim under the Abadies they have no greater right than the Abadies have if the latter see fit to assert it. Whatever interest the plaintiffs have must be worked out through the Abadie title.

An easement lies only in grant, and the plaintiffs in their petition state that the easement they here claim was granted by deed executed in due form more than thirty years ago but now lost and no record of it can be found.

Although in legal contemplation an easement lies only in grant, yet evidence to establish it is not necessarily a deed, because an easement may have existed for such a length of time and under such circumstances that the law will presume a grant. This is what is meant by an easement established by prescription. When the evidence sufficiently shows the use of the privilege for a length of time equal to that prescribed by the Statute of Limitations for acquiring title to land by adverse possession, and that the use was ad-

verse and under a claim of right with the knowledge of the landowner, the right to the easement is established. And whilst it is necessary to show that the owner had notice of the use that was being made of his property and the character of the use and that it was under a claim of right, yet express notice is not necessary; it may be inferred from the circumstances, if the circumstances are such as to justify the inference. And where there has been actual continuous use for the prescribed period, under a claim of right, with the knowledge of the owner, the law will raise a presumption of a grant unless the owner can show that the use was by permission and under such circumstances the burden is on the owner to show the permission. [Jones on Easements, sec. 164; Washburn on Easements (4 Ed.), 156.]

The above is a statement of law as strongly in the plaintiffs' favor as they can claim, and they insist that their case comes within the law as stated.

The four essential facts for the plaintiffs to prove in order to sustain their claim to an easement by prescription are, first, user for the prescribed period; second, that the user was adverse; third, that it was under a claim of right; fourth, notice to the owner of the user and of its character and of the claims of right. [Brinck v. Collier, 56 Mo. 166; Pitzman v. Boyce, 111 Mo. 387; Field v. Mark, 125 Mo. 502; Smith v. Sedalia, 152 Mo. 283; Curtis v. Water Co., 20 Ore. 34, 10 L. R. A. 484; Jones on Easements, sec. 270.]

The position of the plaintiffs is that the buildings and the alley between them are themselves witnesses and tell the whole story. The argument is that the location of the buildings with reference to the alley necessarily tells of an agreement whereby each landowner contributed of his land a part to make the alley and thereby cross-easements were created. And the inference they draw from those physical facts, plus the fact that the tenants of the Abadie property used

the alley, make up the whole sum of the plaintiffs' claim.

Mr. Abadie testified that he never heard of an agreement or contract of any kind between the owners of the adjoining lands and that the only circumstance from which an inference of such an agreement could be drawn was the position of the houses in reference to the alley.

If the inference sought to be drawn from the physical fact is no stronger than a theory that it might have been so, while it is just as probable that it might have been for some other purpose, it is not a sufficient foundation upon which to build a prescriptive right. The evidence does not show but that the buildings constituting the Veranda Row were built before that on the Abadie lot. From the construction of the alley, with the windows and doors opening on it and the area-ways entering through it into the cellars, the natural inference to be drawn is that it was left there for the use of the tenants in the Veranda Row. It was the only means by which they could get light and air from the rear, ingress and egress, and use the cellars for the purposes for which cellars are usually used. The alley thus left was not very wide, but it was sufficient for the purpose designed, and considering the location, was of reasonable width. The fact that it was wider at the St. Charles street end than at the other end may be reasonably accounted for by the fact that the south half of the property was 20 feet wider than the north half. The alley as laid out on the Ames property was wide enough for persons to pass conveniently in and out, but was not wide enough for vehicles, and the addition of the 2 feet 1 3-4 inches did not change it in that respect. There was no use the Ames tenants made of the alley that they could not have made of it without that part on the Abadie lot. It is said in the brief of appellants that the strip of 2 feet 1 3-4 inches on the

Abadie side is not in itself wide enough to be serviceable as an alley, and hence the inference that it must have been the intention of the man who built the Abadie house to use that strip in connection with the 3 feet 1 1-3 inches left open on the Ames property. It may be that he counted on neighborly treatment from his neighbor, seeing that his use of his neighbor's strip would not put his neighbor to inconvenience, but the situation speaks as well of use by courtesy as of use by right, and it gives no notice of claim of right.

The theory of the cross-easement is that the adjoining landowners at some period in the past agreed to contribute out of their respective properties sufficient to make an alley for their joint and equal use and to this end the owner of the Ames property gave all the land necessary extending from St. Charles street to Washington avenue while the owner of the other lot gave only a strip of 2 feet 1 3-4 inches along the east line of his own house; a very unequal exchange; especially, when we consider that the contribution from the Abadie lot was not necessary to the efficiency of the alley on the Ames property.

In attempting to raise a presumption of an old grant from user and conduct of the parties we must not confine our observation to the conduct of one party only. Whilst there was some evidence showing that the alley was open and in somewhat promiscuous use before the Abadies became the owners, nearly all the acts relied on as tending to sustain the claim of adverse user occurred after they were the owners. Yet the evidence shows that between 1870 and 1880 the Abadies executed three warranty deeds of trust covering the whole of their lot, including the strip that it is now claimed the Ameses had a cross-easement in. Those deeds, especially when recorded, became public proclamations of repudiation by the Abadies of any such cross-easement; they were totally inconsistent with the cross-easement theory.

Ordinarily when a party seeking to establish title to real estate by adverse possession for ten years shows that when he took possession he had a deed recorded which purported to convey the title to him, that fact in connection with notice of possession is regarded as notice to the owner of the claim of title. On the same principle the execution and recording of those deeds by the Abadies was the serving of notice on the Ameses that the Abadies claimed unrestricted dominion of their whole lot. And the very lease under which the plaintiffs claim is in the same category, it contradicts the idea of a cross-easement; if any third party should successfully assert a right to an easement in that strip of 2 feet 1 3-4 inches, the plaintiffs would have an action against the Abadies for a breach of their warranty of title.

When we are left, as the evidence on this point leaves us, merely to conjecture, the triers of the fact have as much cause to conclude that these houses were built at different times and that each owner built his house as he thought best, as that they were built with an understanding to conform to a given situation. Mere use of a passage over another's land for a long time with his knowledge is not necessarily an adverse use. The circumstances may be such as to authorize an inference that the use is adverse, but they may also be such as to indicate that the use was by permission.

The presumption in the beginning is that the user is in subordination and not adverse to the true title (Hunnewell v. Burchett, 152 Mo. 611), but when the circumstances proven are such as to overcome that presumption and justify an inference that it is adverse, then the burden shifts to the owner to show that it was by permission, but this burden is not thrown on the owner if the circumstances shown by the claimant of the easement are as consistent with the idea of permission as they are of adverse claim .

If one for his exclusive use makes a road across

the land of another it is one circumstance going to make up a combination of circumstances, if there are such, from which adverse user may be inferred. But if the owner of the land opens a road across it for his own use and uses it and keeps it open for his own use, the fact that he sees his neighbor also making use of it, under circumstances that in no way injures the road or interferes with his own use of it, does not justify the inference that he is yielding to his neighbor's claim of right or that his neighbor is asserting any right; it signifies only that he is permitting his neighbor to use the road, as Mr. Abadie said was the way he understood the use his tenants were making of this alley, that is, "in a neighborly way."

The use required to create or establish an easement by prescription, must not only be continuous for the period prescribed, but it must be adverse and under a claim of right. This notice need not be expressed, it may be inferred from the circumstances, but it cannot be inferred unless the circumstances justify the inference. What was there in the circumstances of this case to justify an inference that the Abadies were asserting such a right? Here was an open alley on the Ames property, its very form and structure proclaiming that it was intended for the use of the tenants of the Veranda Row; unguarded except at night, so that any one so inclined might pass through it, but the doing so in no way injured the owner or put him to inconvenience or interfered with the private use for which it was designed. If the owner of the Ames property had stationed a guard to warn the Abadie tenants to keep within the limits of their own 2 feet 1 3-4 inches the act could have been attributed to no motive except a desire to show an unfriendly or unneighborly feeling. If the tenants of the Abadie property, in passing through the alley, from the front to the rear of their premises, varied a little to the east and got on the Ames side of

the line how was it practicable, even if desirable, to keep them off?

Mr. Abadie spoke of a conference between himself and Mr. Ames about putting a gate at the Washington avenue end of the alley. It would have served Mr. Ames no good purpose to extend a gate across that part of the alley on his land if the part on the land of Mr. Abadie was left open, therefore it was necessary to obtain Mr. Abadie's consent to place the gate there. That act signifies nothing more in the way of recognizing a right in Mr. Abadie than that he was the owner of the strip of 2 feet 1 3-4 inches.

There is nothing in the plaintiffs' evidence tending to show an adverse user or a claim of right to use the alley.

The judgment is affirmed.

All concur, except *Marshall, J.*, not sitting.